# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| Warren Chiropractic & Rehab Clinic P.C., | ) | **PLAINTIFF DEMANDS** |
| John Mousa Mufarreh, D.C., | ) | **TRIAL BY JURY** |
| Keith Gover, D.C., | ) | |
| Priority Patient Transport LLC, | ) | |
| George Mousa Mufarreh, and | ) | |
| Sharon Michele Smith, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm") for its

Complaint ("Complaint"), alleges as follows:

## I.   NATURE OF THE ACTION

1.   This action seeks to recover money fraudulently obtained by the

defendants from State Farm through the submission of hundreds of bills and

related documentation from Warren Chiropractic & Rehab Clinic P.C. ("Warren"),

for treatment and transportation services  purportedly provided to individuals (the

"patients") who were involved in motor vehicle accidents and eligible for Personal

Injury Protection benefits ("No-Fault Benefits") under State Farm's insurance

policies.   The bills and related documentation submitted to State Farm for

treatment and transportation services were fraudulent because the services either were not performed or were not medically necessary

2.      The defendants are:  (a) Warren, which is the entity through which the bills and related documentation for treatment that are fraudulent were submitted to State Farm; (b) the chiropractor owner of Warren, John Mousa Mufarreh ("John Mufarreh"), who designed and implemented the fraudulent treatment protocol at Warren; (c) chiropractor Keith Gover ("Gover"), who works under the supervision of John Mufarreh at Warren and implements the fraudulent treatment protocol at Warren; (d) Priority Patient Transport, LLC ("Priority Transport") which is the entity that submits bills and related documentation that are fraudulent to State Farm for medically unnecessary transportation services for the patients to get to and from Warren for treatment; (e) George Mousa Mufarreh ("George Mufarreh"), who owns and/or operates Priority Transport; and (f) Sharon Michelle Smith ("Smith") who also owns and/or operates Priority Transport.

3.      As described below, the bills and related documentation that the defendants submitted, or caused to be submitted, to State Farm were fraudulent because the services either were not performed or were performed pursuant to a fraudulent predetermined protocol of treatment ("Predetermined Protocol"), rather than to address the actual, unique needs of the individual patients.  Specifically, pursuant to the Predetermined Protocol, Warren purports to provide the same four

passive modalities—chiropractic manipulations, hot and/or cold packs, traction, and massage—on virtually every visit.  For some patients, typically after at least eight weeks of only passive modalities, Warren purports to replace the massage with "therapeutic exercise," which for every one of those patients entails riding a stationary bicycle for fifteen minutes or using a treadmill.  *See* Ex. 1.  Warren purports to provide the Predetermined Protocol to patients for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof.  *See* Ex. 1.

4.     The patients are not legitimately evaluated and diagnosed and the treatments are not changed based on purported reexaminations, diagnostic tests, or for any other reason.  The Predetermined Protocol was not designed to legitimately examine, diagnose, and provide medically necessary services to address the unique needs of the individual patients.  Instead, the Predetermined Protocol was designed and carried out to:  (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of bodily injury ("BI") and/or uninsured motorist ("UM") claims to curry favor with a group of personal injury attorneys ("PI Attorneys") with whom Warren appears to have substantial *quid pro quo* cross-referral relationships.

5.     As part of the Predetermined Protocol, John Mufarreh, Gover, and other chiropractors at Warren also fill out and sign monthly "disability certificates"

to virtually every patient.  *See* Ex. 1.  The "disability certificates" are not based upon legitimate evaluations and determinations of true "disabilities." Instead, they falsely represent that the patients are disabled from working, driving, and/or performing household tasks, and are used by the patients to support claims to State Farm for No-Fault Benefits including wage loss, transportation, attendant care, and/or replacement services.  Using the disability certificates to justify the purported need for transportation services to and from Warren is particularly important to the success of the scheme because it (a) makes it easier for patients to get to and from Warren which, in turn, encourages patients to keep their appointments and continue treating, (b) supports the "objective manifestation" of injury necessary to support a BI or UM claim, and inflates the value of such claims based upon the exorbitant charges submitted by the transportation companies, and (c) supports No-Fault claims for exorbitant charges by transportation services, including Priority Transport which has billed State Farm for most of the transportation services purportedly provided to Warren's patients.  Legitimate transportation costs are reimbursable as part of an individual's No-Fault Benefits as an allowable expense when they are objectively reasonable and medically necessary for the patient's recovery.  As described below, the transportation services provided by Priority Transport are neither.

6.     As part of the Predetermined Protocol, John Mufarreh, Gover and other chiropractors who work under their direction also refer patients for medically unnecessary MRIs the purported results of which are not used for any diagnostic, treatment, or other clinical purpose.  In fact, regardless of the purported MRI results, Warren's patients continue to receive the same Predetermined Protocol treatment after the MRIs that they received before the MRIs.

7.     To procure patients for their scheme, the defendants employ and use runners, cappers, and steerers with the intent to obtain patients and to fraudulently obtain their No-Fault benefits from State Farm, in violation of MCL 500.4503(h) and (i).  This is an important aspect of the scheme because patients are the lifeblood of the scheme both for the defendants and for the PI Attorneys with whom Warren has cross-referral relationships.

8.     As a result of the Predetermined Protocol: (a) patients are not legitimately examined, diagnosed, and appropriately treated for conditions they may have; (b) patients are subjected to a predetermined laundry list of examinations, diagnostic tests, and treatments that they do not need; and (c) PI Attorneys use defendants' bills and related documentation that re fraudulent to present inflated UM claims against State Farm and BI Claims against at-fault drivers.

9.     Defendants' scheme began at least as early 2005, and has continued uninterrupted since that time.

10.     Based upon defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Complaint.  Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.  *See* Ex. 1.

11.     This action seeks a declaratory judgment that State Farm is not liable for any pending bills or bills submitted during the pendency of this action by the defendants based upon the above-described conduct.  This action also asserts common law claims for fraud and unjust enrichment, as well as statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO"), to recover actual damages of at least $1,000,000 in No-Fault Benefits, plus treble damages and costs, including reasonable attorneys' fees.

12.     State Farm has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association or any other source for any of the claims at issue in this case.

## II.    JURISDICTION AND VENUE

13.    Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

14.    Pursuant to 28  U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §1961 *et seq.* ("RICO") because they arise under the laws of the United States.

15.    This Court has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

16.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.    THE PARTIES

### A.    Plaintiff

17.    State Farm Mutual Automobile Insurance Company is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed and engaged in the business of insurance in Michigan.

### B.    Defendants

18.    Warren Chiropractic & Rehab Clinic P.C. is a Michigan corporation, with its principal place of business at 19201 W. Warren, in Detroit, Michigan.

From at least 2005 through the present, Warren has knowingly submitted, and caused to be submitted, hundreds of bills and related documentation that were fraudulent to State Farm in the claims described, in part, in the chart attached hereto as Ex. 1. Each and every bill described in Ex. 1 was fraudulent in that the services described in the bills and related documentation were purportedly medically necessary when, in fact, the services either were not performed or were not medically necessary and were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the defendants have substantial *quid pro quo* cross-referral relationship.

19.     John Mousa Mufarreh, D.C. resides in and is a citizen of the State of Michigan. John Mufarreh is a licensed chiropractor who works at and is the sole owner of Warren.

20.     Keith Gover, D.C. resides in and is a citizen of the State of Michigan. Gover is a licensed chiropractor who works under the supervision of   John Mufarreh at Warren.

21.     In the foregoing roles, John Mufarreh has knowingly coordinated and controlled the implementation of the Predetermined Protocol for Warren's patients and Gover has knowingly implemented and carried it out.

22.     Priority Patient Transport LLC is a Michigan corporation, with its principal place of business at 6722 Stahelin in Detroit, Michigan.  From at least January 2010 through the present, Priority has knowingly submitted, and caused to be submitted, bills and related documentation that were fraudulent to State Farm for medically unnecessary transportation services purportedly provided to Warren's patients.  *See* Ex. 2.

23.     George Mousa Mufarreh resides in and is a citizen of the State of Michigan.  George Mufarreh is John Mufarreh's brother, and together with Sharon Michelle Smith, he owned and/or controlled Priority Transport.

24.     Sharon Michelle Smith resides in and is a citizen of the State of Michigan.  Smith has been described by George Mufarreh as his "fiancé" and "life partner," and together Smith and George Mufarreh have owned and/or controlled Priority Transport.

25.     Each defendant's participation and role is necessary to the success of the scheme.  No one defendant is capable of carrying out the scheme without the participation of the others.  All of the defendants act in concert with the common purpose of defrauding State Farm.

IV.   **ALLEGATIONS COMMON TO ALL COUNTS**

  A.   **First-Party Claims For Payment Under The No-Fault Act.**

26.   Under the Michigan No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those expenses are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle" MCL §§ 500.3105, 3107(1)(a).  A claim for damage, loss or injury made by an insured against his or her own insurer is a "First Party Claim."

  B.   **Tort Claims For Non-Economic Loss**

27.   Individuals who are not substantially at fault for the accidents underlying their claims may also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accidents ("At-Fault Drivers") through a BI Claim, only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL § 500.3135; and (b) if recovery under the BI Claim is insufficient, from the patients' own insurance companies through an UM Claim.

28.   An individual has suffered serious impairment of body function when his or her general ability to conduct the course of his normal life has been affected

as a result of the injury.  A determination of serious impairment requires an analysis of several factors, including:  (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; (e) the prognosis for eventual recovery; and (f) whether there is "objective manifestation" of the injury.

### C.    *Quid Pro Quo* Relationships Between Defendants and PI Attorneys

29.    The success of defendants' scheme depends heavily upon *quid pro quo* cross-referral relationships with PI Attorneys who represent patients in connection with BI Claims and UM Claims.  Specifically, the PI Attorneys are motivated to refer patients to the defendants because the PI Attorneys can rely upon the Predetermined Protocol to (a) establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the patients and their other clients, and (b) inflate the value of the BI Claims and UM Claims.  This, in turn, increases the amounts of the contingency fees available to the PI Attorneys through the BI Claims and UM Claims.  At the same time, defendants are motivated to refer patients to the PI Attorneys and provide them with bills and reports to curry favor with and induce more patient referrals from the PI Attorneys.

30.    To illustrate, more than 80% of the Warren patients in Ex. 1 were represented by an attorney in connection with their treatment at Warren.  Within

the last four years, almost two thirds out of these patients were represented by one of only three law firms:  Lobb & Associates; Weiner & Associates; and Haas & Goldstein, P.C. (which also has represented and/or currently represents John Mufarreh, Gover, George Mufarreh and Sharon Smith).

### D.   The Legitimate Treatment of Patients With Subluxations, Strains, and Sprains

31.   When an individual has been in a motor vehicle accident and complains of neck and back pain, a licensed professional must obtain a history and perform an individually-tailored examination to arrive at a valid, differential diagnosis.  Based upon the differential diagnosis, a licensed professional must engage in medical decision making to design a specific treatment plan that is tailored to the unique circumstances of each patient.  During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient.  As set forth herein, these basic principles were not followed at Warren.

32.   As discussed below, the Warren Chiropractors do not perform legitimate examinations to arrive at a valid, differential diagnosis of each patient. Instead, examinations are performed, if at all, to support a predetermined diagnosis of subluxations for all Warren patients in addition to diagnoses of sprains and/or strains for most patients to three or four regions of the spine.  The terms subluxation refers to the displacement of bones that form a joint.  Subluxations can

occur in one or more of four major areas of the spine: the sacrum (pelvic) vertebrae, the lumbar (torso) vertebrae, the thoracic (middle) vertebrae, or the cervical (neck) vertebrae. Chiropractic treatment plans for individuals with subluxations often include chiropractic manipulation to reduce the subluxation and mobilize the joint.

33.     Sprains and strains, however, involve injuries to ligaments, muscles, and/or tendons. With a sprain, an individual's ligaments, the connective tissues that join the bones together, are overstretched or torn. A strain occurs when a muscle and/or tendon is overstretched or torn. Treatment plans for individuals with strains and sprains may involve no treatment and/or medicines at all because many of these kinds of injuries may heal within weeks without any intervention, or may include a combination of medicines and passive and active modalities.

34.     Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, manual therapy, massage, and traction. Active modalities require patients to affirmatively participate in their treatment, and include many different kinds of stretching, exercising, and strengthening exercises.

35.     Passive modalities are performed to reduce pain and to facilitate active modalities which are performed to promote the healing of strains and sprains. In legitimate treatment plans, passive modalities are typically used to the

extent necessary to reduce pain and to facilitate active modalities that are designed to address each patient's unique needs and circumstances as soon as practicable to promote healing of strains and sprains.

36.     While one or more particular passive modalities may be appropriate for any particular patient on any particular visit, the same combination of passive modalities on virtually every visit should seldom, if ever, be appropriate for any patients.  The decision of which, if any, types of passive and active modalities are appropriate for each patient, as well as the level, frequency, and duration of the various modalities, should be individualized depending on the patient's unique needs and circumstances and response to treatment (or lack thereof).

37.     Treatment plans, once implemented, should be periodically reassessed and modified based upon updated histories, re-examination findings, reported pain levels, and return to functionality, all using a well-documented decision-making processes.

38.     If patients are disabled due to their injury, a licensed professional must make an individualized evaluation of the patient's diagnosed disabilities, expected length of treatment, and what specific accommodations are necessary in light of the patient's work status, medical history, and daily activities.

39.    Patients should be discharged from treatment when they have reached maximum medical improvement, and/or when treatment results in no significant clinical improvement, such that no further treatment is likely to benefit the patient.

40.    The above-described process of history, examination, diagnosis, and treatment must be documented for the benefit of:  (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm so that they can pay for reasonable and necessary treatment.

41.    As described next, patients at Warren are not appropriately examined, diagnosed, or treated for their individual conditions.  Instead, they are subjected to a Predetermined Protocol in which John Mufarreh, Gover, and other chiropractors at Warren examine the patients to support predetermined diagnoses and treatment plans, which are the same Predetermined Protocol for all patients.   The Predetermined Protocol was not designed for the medical benefit of the patients, but to:  (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the defendants have a substantial *quid pro quo* cross-referral relationship.

E.     **Defendants' Scheme And Fraudulent Predetermined Protocol**

1.     **Solicitation**

42.     To procure patients for their scheme, the defendants employ and use runners, cappers, and steerers with the intent to obtain patients and to fraudulently obtain their No-Fault benefits from State Farm, in violation of MCL 500.4503(h) and (i).     This is an important aspect of the scheme because patients are the lifeblood of the scheme both for the defendants and for the PI Attorneys with whom Warren has cross-referral relationships.

43.     Specifically, patients are often referred to Warren by either (a) their attorney, (b) an "investigator" who is employed by an attorney to solicit clients by identifying individuals who were involved in automobile accidents, recruiting them as clients, and steering them to Warren, or (c) are directly contacted by Warren. Patients who treated at Warren have testified that shortly after their automobile accidents, they received unsolicited calls from individuals working with the PI Attorneys and/or Warren, at least one of whom falsely identified herself as working for State Farm.  The patients are told that a car will pick them up and take them to Warren for evaluation and treatment and that the costs will be covered by insurance.  For example:

- One patient testified that an individual named "Susan" called unsolicited.  When the patient asked how Susan got the patient's number, Susan explained that she got the patient's number from an accident database they keep and then told the patient to go to Warren Chiropractic.  A car from Priority Transport then picked the patient up and drove the patient to Warren.  The patient stated that he/she could drive, but that Warren provided transportation as a "convenience" to the patient through Priority Transport (which Priority then billed to State Farm as a medical necessity).

- A second patient testified that an individual calling himself an "advocate" called unsolicited and said that the patient could get medical help and money from the  car accident the patient was in.  The "advocate" came to the patient's house and eventually sent the patient to Warren Chiropractic who arranged for the patient's transportation.  The patient said they were not given a choice as to where to treat or what transportation company to use.

- Another patient similarly testified that she got an unsolicited call from "Sue" after an automobile accident, and was told that Sue worked for another person named Ed White.  Sue implied that she was with State Farm and directed the patient to treat at Warren.  In depositions, John Mufarreh himself has acknowledged that he has a good friend named Ed White who is a private investigator and that he has a receptionist who goes by Sue (although that receptionist has denied participating in any solicitation).

In addition to patient testimony, John Mufarreh himself has also admitted during a deposition that if he "happens" to know someone was injured in an automobile accident, he "sometimes" calls them himself and tells car accident victims about his "services."

44.   John Mufarreh has also testified multiple times to having relationships with various PI Attorneys and has acknowledged that their clients form a "basis" for his patients at Warren.  In fact, John Mufarreh and Gover have themselves been

represented by one of the same PI attorney firms that also represent many of the Warren patients.

45.     The defendants and PI Attorneys prey upon and profit from automobile accident victims by encouraging and steering them to seek treatment at Warren, regardless of their individualized medical situation or whether they even need treatment.

### 2.     Initial Visit At Warren Chiropractic

#### a)     Initial Examination

46.     Once patients arrive at Warren, they are given an initial examination in accordance with the Predetermined Protocol.  The examination is performed by John Mufarreh, Gover, or by another chiropractor who fills-in when John Mufarreh or Gover is not available.   John Mufarreh has testified that in all cases, he supervises and is responsible for all care and instructs Gover and any other chiropractor at Warren how to treat the patients.  In or about the spring of 2009, Gover began examining and treating patients at Warren on a part-time basis.  Since late 2009, however, Gover has been examining and treating patients on a full time basis six days a week.  During that time, Gover and Mufarreh have performed most of the examinations and treatments of patients at Warren, with other chiropractors occasionally filling in when they are absent.

47.    The documentation that Warren submits to State Farm often consists of a two-page form entitled "Chiropractic Exam."  *See, e.g.,* Exs. 3(a-c).  The examination forms are not signed so it is impossible to tell who actually examined the patient.  Absent from the initial examination form is any reflection that the patients' vital signs are recorded at all.  The form purports to record accurate ranges of motion, but for those patients who are re-examined (and many, as discussed below, are not), the later progress notes typically show only small increases in range of motion or, in some cases, decreases.  In a legitimate treatment setting, many patients with subluxations, sprains, and strains should experience a significant increase in range of motion after just a few weeks.  The lack of significant improvement in the documented ranges of motions for Warren's patients undermines the credibility of Warren's patient documentation, as well as the credibility of the treatment plans which are not modified even as they do not appear to provide significant improvement in patients' ranges of motion.

48.    "Chiropractic Case History" forms are also filled out at the initial visit. *See* Exs. 4(a)-(c).  These forms purport to detail the patient's prior surgeries, injuries, and illnesses, ranging from ailments as common as hypertension or diabetes, to other serious medical conditions such as bipolar disorder, epilepsy, and multiple sclerosis.  Because of other medical issues, a great number of the Warren patients are on prescription medications.  Despite the patients' concurrent medical

issues that can affect both the efficacy and safety of the treatments at Warren, there is no indication in the patient files that Warren ever obtains records from or even speaks to the patients' other medical providers before starting or anytime during treatment. Indeed, John Mufarreh has testified that "following up with a PCP [primary care provider] seems to be a hard thing" for himself, Gover and other chiropractors at Warren. Furthermore, regardless of the patients' unique medical histories, they are subjected to the same Predetermined Protocol.

### b)    Unnecessary X-rays

49.    At the initial visit, John Mufarreh, Gover, and other chiropractors at Warren order multiple x-rays for a vast majority of their patients unless a patient's medical condition (such as pregnancy) prevents x-rays from being taken. These x-rays are not medically necessary, and their results are not incorporated into and do not alter the treatment plan for patients at Warren. Instead, the x-rays are a part of the Predetermined Protocol and are performed to increase the amount Warren can bill State Farm. For every patient, seven x-ray views of the cervical, thoracic, and lumbar areas are ordered, even where the patient has not reported symptoms in each of those areas. *See* Ex. 1. These x-rays are ordered even for the approximately one-third of Warren patients who have already received x-rays at a hospital following their automobile accident.

50.     The x-rays are typically taken by one of the receptionists who work at Warren.  The receptionists who take the x-rays have not had any formal education and hold no medical licenses or certifications, but John Mufarreh has testified that he has "cross-trained" these receptionists to perform x-rays.  Indeed, one of the receptionists acknowledged that she orders seven x-rays on most Warren patients.  When asked about the risks of x-ray radiation, that same receptionist testified that although she thought that x-rays could cause some forms of cancer, she never explains this to the patient or covers any part of them with a lead vest during the x-rays.  The x-rays are performed whether they are needed or not to generate a bill as part of the assembly line of charges Warren submits.  This fraudulent use of x-rays for Warren patients has resulted in bills submitted to State Farm in an amount of more than $75,000 for x-rays alone, pursuant to which State Farm has paid Warren more than $25,000.

### c)     Predetermined Diagnosis

51.     Mufarreh, Gover, and other chiropractors at Warren ultimately diagnose patients according to the Predetermined Protocol, without any legitimate, individualized assessment of their injuries, comorbidities, preexisting conditions, or medical needs.  Furthermore, the documentation of the diagnoses submitted by Warren is fraudulent because the pervasive patterns in the documentation are not credible.  Based on the diagnostic codes submitted to State Farm, *every single one*

of the Warren patients are diagnosed with a subluxation of the spine without exception. *See* Ex. 1. Moreover, despite the fact that many patients complained only of neck or head pains, patients are almost always diagnosed with subluxations, as well as sprains and strains, in at least three areas of the spine from the neck all the way down to the pelvis - the cervical, thoracic, and lumbar vertebrae. *Id.* This diagnosis is a necessary part of the defendants' scheme so that they can substantiate their charges for administering the Predetermined Protocol modalities to three or four regions of the patients' spines on every visit. These diagnoses are false because, among other things, they are not the product of an appropriate and individually-tailored initial examination and are simply an effort to maximize the amount of money the defendants can collect.

### d)    Disability Certificates

52.    Another component of the defendants' scheme that begins at the initial visit involves the issuance of monthly "disability certificates" representing that the patients are unable to work, drive, and/or perform household tasks. These "disability certificates"  are purportedly signed by Mufarreh and/or Gover for almost all Warren patients, and are used to support claims for wage loss benefits, transportation, attendant care, and replacement services. The disability findings also support an "objective manifestation" of injury to satisfy the threshold for bringing a BI or UM Claim, which is critical to the success of the scheme because

it enables the defendants to curry favor with PI Attorneys who are a vital referral source.

53.    John Mufarreh, Gover, and other chiropractors at Warren merely check off blank, preprinted disability certificate forms without any legitimate, individualized evaluation of the patient's actual limitations or any indication that any such limitations are due to any condition with which the patient was diagnosed.  There is no discussion in the patient's progress notes or other medical charts about the patient's specific home activities, driving abilities, work activities, or any other information that would allow a real assessment of the disabilities of the patient and the accommodations that may be medically necessary.  In fact, many Warren patients are determined to be "disabled" from driving when they have no car or don't drive; and "disabled" from working when they have no job.

54.    Moreover, it is the receptionists at Warren, not John Muffareh, Gover, or other chiropractors at Warren, who are filling out the disability certificates. When comparing, for example, Exs. 5(a) through (d), it is evident that the same xeroxed signature of John Mufarreh is used.  The dates, however, have different handwriting as can be seen most readily when comparing Exs. 5(a) and 5(c), indicating that different people are actually filling out the forms and using John Mufarreh's xeroxed signature.  When confronted with his xeroxed signatures in a deposition, John Mufarreh admitted that he provides blank, signed disability

certificates for the office to use and keeps no records as to who is actually filling out the certificate. John Mufarreh has also testified that sometimes they are filled out the day of the examination, but other times they are filled out before the disability period or even after the disability period and then backdated.

55.    In addition to supporting the "objective manifestation" of serious impairment of bodily function used by PI Attorneys to support BI and UM claims, these certifications also enable patients to receive transportation to and from Warren, at no cost to the patients, but at a significant cost to State Farm. By providing transportation at no cost to the patients, the defendants are able to maximize the likelihood that patients will attend their scheduled visits and continue treatment.

56.    In addition, the certificates directly benefit John Mufarreh's brother, George Mufarreh who along with Sharon Smith owns and controls Priority Transport. Approximately forty percent of the patients given disability certificates by Warren after Priority Transport was created have received transportation from Priority Transport. Smith and George Mufarreh started Priority Transport by consulting John Mufarreh and operate the business from George Mufarreh's basement.

57.    Legitimate transportation benefits may be reimbursable as part of an individual's No-Fault Benefits if they are objectively reasonable expenses, which

are medically necessary for the patient's recovery, rehabilitation, and care. Such transportation services may include vehicles equipped for wheel chairs, drivers that can help patients get in and out of vehicles, and other objectively reasonable accommodations based on a patient's individualized needs and legitimately diagnosed conditions related to the automobile accident. However, many of Warren's patients can and do drive, but they are certified as "disabled" by John Mufarreh, Gover, and other chiropractors at Warren and are told they can use the transportation services of Priority Transport as a "convenience." Although John Mufarreh has testified multiple times that he "never" refers patients to a particular transportation company, one Warren employee testified under oath that John Mufarreh specifically tells them to give out Priority Transport cards to patients and another employee testified that Priority Transport is one of only two transportation companies that Warren currently uses. Moreover, multiple patients have also confirmed that they were referred to Priority Transport by John Mufarreh, and at least one patient has described Priority Transport as John Mufarreh's company.

58.    Notably, although Priority Transport regularly transports Warren patients who have been issued disability certificates, Priority Transport is not equipped to transport disabled patients. The insurance application for Priority Transportation, which was signed by Sharon Smith, reads: "Insured will transport *able bodied* passengers to and from their local doctor's office" and there is "no

modifications on vehicles to accommodate persons with disabilities" (emphasis added).  Smith answered "no" on that same form when asked if Priority Transport assists passengers in and out of vehicles.  Smith has similarly testified under oath that Priority Transport's drivers receive no special education or training in transporting disabled patients.  George Mufarreh, who in fact attended medical school in the Dominican Republic and has worked as a medical assistant, stated that although they are a "medical transport" they don't handle patients with "spinal injuries" because "you need special training for that."  The patients tell a similar story.  One Warren patient who used Priority Transport testified that she could drive herself and only used Priority because it was provided for her by Warren Chiropractic and was "convenient."

59.     Even though Priority Transport is not equipped to transport medically disabled patients, their business model is set up specifically to only transport patients certified as disabled where they can get reimbursed for the transportation by insurance companies like State Farm through Michigan's No-Fault laws.  The insurance application for Priority Transport states that 100% of their fares are paid by "Auto PIP claims – pd by insurance companies."  George Mufarreh has similarly testified that the "business protocol" of Priority Transport is to only transport patients that have disability certificates so that they can bill State Farm and other insurers for the transportation services.  Smith testified that they obtain

these disability certificates from the patient or the chiropractor and communicate with the doctor's offices to be sure they have the disability certificates and can get reimbursed from the insurance companies for the transportation services.

60.   The fees charged by Priority Transport to transport, in their own words, "able-bodied" patients that they neither help in or out of vehicles that are not modified to accommodate people with disabilities are truly outrageous.   A patient taking a cab by him or herself, for instance, to and from Warren would pay $2.50 for the trip plus $1.60 per mile.   That same patient could have a luxury sedan to themselves for approximately $33 one way, plus gratuity.   Priority Transport, however, taking advantage of Michigan's No-Fault laws and knowing they are only submitting their bills to insurance companies like State Farm, charges $55 one way plus $3.75 a mile.   A comparison of their rates for a sample of Warren patients in Ex. 1 can be seen below:

| Patient Claim No. | Actual Miles From Warren | Roundtrip Price Taxi | Roundtrip Price Lux. Sedan | Roundtrip Price Priority Patient |
|---|---|---|---|---|
| 22018X594 | 13.8 | $49.16 | $66 + tip | $213.50 |
| 22B189616 | 15      (Priority Billed for 18.2) | $29.00 | $66 + tip | $178.25 |
| 22B034800 | 6      (Priority Billed for 23.4) | $14.60 | $66 + tip | $197.75 |

This is even more outrageous when considering that Priority transports up to six "able-bodied" patients in its van at the same time, allowing them to multiply their already astronomical fees sixfold.

61.     Based on Warren's referrals, Priority Transport is able to obtain and profit from patients' No-Fault benefits.     In turn, the "complimentary" transportation serves as an inducement to the Warren patients to treat at Warren and helps ensure that they will continue treatment as long as possible at Warren with maximum profit for all defendants.  Priority Transport also transports patients to and from PI Attorneys to ensure that they continue to use those attorneys.  By repeatedly and falsely certifying that the patients are disabled, John Mufarreh, Gover, and other chiropractors at Warren ensure that their fraudulent scheme can continue by:  1) incentivizing patients to continue to treat at Warren where they will receive disability certificates that can reimburse them for replacement services, attendant care, and wages; 2) provide them "free" transportation; and 3) benefiting the PI Attorneys by bolstering their clients' BI and UM damages claims.

### 3.      Fraudulent Treatment

62.     After the initial "diagnosis," the Warren patients typically begin treatment the same day they are examined.  Initially, treatment consists of the same four passive modalities—chiropractic manipulations, hot and/or cold packs, massage, and traction—then continues for months without any significant

improvement (with some patients worsening as their individual medical needs are not adequately met). As discussed above, soft-tissue injuries often resolve themselves (even without treatment in many cases) well within eight weeks unless there are comorbidities that complicate the treatment. At Warren, however, the average length of time a patient is treated is staggeringly more than nine months. John Mufarreh has testified in response to questions about the length of such treatments that in his view some of his patients simply need treatment "for life." Gover has stated that he isn't even allowed to discharge a patient unless John Mufarreh authorizes the discharge. Chiropractors at Warren typically continue to treat the patients until they unilaterally decide to stop coming or until State Farm denies payment of further services based on an independent medical examination.

63.    As set forth in Ex. 1, every patient at Warren receives the same passive modalities on nearly every visit regardless of their unique medical history, complaints, and test results. Exercises (i.e. riding a stationary bike or walking on a treadmill) are not added to the Predetermined Protocol until, if at all, typically until patients have received at least eight weeks of only passive modalities. Gover testified that when he started at Warren Chiropractic John Mufarreh told him "the orders we like to do things, you know, what rudiments we use, what procedures we do," and then went on to explain the protocol:

After we get a patient history, we'll then interview the patient. We will do an exam on the patient. Based on the exam, we'll also include digital palpation. We will then, based on all that information, we will then do an x-ray if it's . . . if the examination calls for it. *[As can be seen in Ex. 1, every examination purportedly calls for it unless the patient has a medical condition preventing x-rays from being taken].* Following the . . . x-ray, I will analyze the x-rays. I will meet with the patient, go over the findings. If we have time at the first visit, we will then do the treatment, which would include the adjustment. We would then do heat, massage, traction.

And that is exactly what happens with patients regardless of their unique circumstances and the results of their examinations – they are x-rayed, diagnosed with subluxations to three or four regions of the spine (in addition to sprains and/or strains in most instances), and then receive chiropractic manipulation, heat, massage, and traction (with exercise – overwhelmingly fifteen minutes on a stationary bicycle - added in place of massage after typically at least eight weeks of only passive modalities).

64. The way in which each of the treatments in the Predetermined Protocol is carried out further evidences their fraudulent nature.

65. <u>Hot Packs:</u> 98% of patients treated at Warren receive hot or cold packs (typically just hot packs) on virtually every visit, for an average of 30 weeks at an average frequency of more than twice a week, which is substantially longer than it should take most soft tissue injuries to heal even without treatment. *See* Ex. 1. In fact, almost half of the Warren patients are still receiving hot/cold pack treatments after six months. According to an office worker at Warren, the hot

packs are always put in the cervical and lumbar regions no matter where the patient's injury actually is.  Warren has billed State Farm over $340,000 for hot/cold packs alone for the patients on Ex. 1.

66.  <u>Traction</u>:  98% of patients also receive traction on virtually every visit.  *See* Ex. 1.  Neither traction nor hot packs are performed by John Mufarreh, Gover, or other chiropractors at Warren but rather, by one of the receptionists. Indeed, one receptionist who performs traction testified that they always have patients lay on the traction table for fifteen minutes: "[I]t's the same for every patient."  The treatment is not actually supervised by John Mufarreh, Gover, or other chiropractors at Warren, and at least one office worker admitted that she wasn't even trained by a chiropractor, but by another receptionist.  Warren has billed State Farm over $430,000 for traction treatments alone for the patients on Ex. 1.

67.  <u>Chiropractic Manipulation</u>:  Chiropractic manipulation is performed on every patient on virtually every visit.  *See* Ex. 1.  Furthermore, regardless of whether the patients complaints are limited to only one area of their back or neck, every patient identified on Ex. 1 received chiropractic manipulations for three to four regions of the spine to justify higher charges.  Warren has billed State Farm over $640,000 for chiropractic manipulations alone for the patients on Ex. 1.

68.   <u>Massage</u>:  There is no licensed massage therapist at Warren.  Gover testified that he didn't even know how to properly do massage.  And yet 97% of Warren patients receive massage for an average length of over 22 weeks.  According to John Mufarreh, certain office workers have certifications in massage therapy.  However, the patient files at Warren do not consistently identify the office worker performing the massage, nor do they contain any prescription or instructions from chiropractors as to the kind of massage to be performed or the particular muscles that should be massaged.  There is also no indication in the files that any of the office workers who perform the massage regularly consult with the chiropractors at Warren.  In fact, one office worker who testified to doing all of the massage on the days she works, stated that she never speaks to the chiropractors at Warren about the patients at all:

> Q:   Do you ever talk to Dr. John [Mufarreh] or Dr. Gover about the patients?
> A:   No.
> Q:   Okay.  There's never any type of communication about how   they're doing or whether they're getting better or worse?
> A:   No.

In at least one case, there is a note on the treatment log stating that a chiropractor was not even in the office on a day when the patient received massage, traction, and hot packs.  Warren has billed State Farm over $240,000 for massage alone for the patients on Ex. 1.

69.   <u>Exercise</u>:  The only change that occurs in some patient's treatment at Warren is that at some point during their treatment, typically after at least eight weeks of only passive modalities, they stop receiving massages and purportedly begin in-patient exercise.  In a legitimate treatment setting, patients with sprains and strains, like those at Warren, should begin transitioning from passive to active modalities as soon as possible in their treatment plan.  In fact, John Mufarreh himself has admitted as much during depositions, estimating that exercise should ideally start within four-eight weeks.  However, at Warren, 97% of the patients have not begun any kind of exercise within eight weeks, and then the only exercise they do is either 15 minutes on a stationary bicycle or, in rare instances, on a treadmill.  *See* Ex. 1.  The records do not explain why exercise begins when it does, why the only exercises the patients purportedly need are pedaling a stationary bike or walking on a treadmill, why no other kinds of stretching, exercise, or strengthening is done, why the exercises never change, how the patients respond to the exercise, and why the patients could not do the same exercises at home. Instead, the daily treatment reports typically document merely "Bike 15" – indicating the person was purportedly on a stationary bicycle for fifteen minutes. Gover himself acknowledged that when patients do exercise they do it for fifteen minutes because that is their "protocol."  John Mufarreh has testified that he typically just lets the patient pick their own exercise and set their own resistance

without making any record.  This sentiment was also reflected by a Warren officer worker who, according to John Mufarreh, monitors the patients doing exercise, but testified that she has no idea what she is supposed to be watching for other than to see if the patient is on the bicycle.  Warren has billed State Farm over $140,000 for exercises alone for the patients on Ex. 1.

70.   Reexamination:  Patients suffering from subluxations and strains and sprains typically should be reexamined every four to six weeks to determine if further treatment is necessary, if the current treatment is working, or whether any modifications to that treatment should be made.  However, most patients in Ex. 1 were *never once* re-examined by any chiropractor at Warren, even when the average treatment time for these patients was for more than nine months.  The patients at Warren who do receive a re-examinations wait on average more than 21 weeks to be reexamined even once.  When the re-examinations occur, boilerplate re-evaluation forms are submitted to State Farm.  The re-evaluation forms look nearly identical to the Initial Evaluation forms, documenting either small improvements (or even decreases) in the patients' ranges of motion.  If these re-examinations were done properly with appropriate treatment, it would be usual to expect significant improvement by the time that the re-examinations were done, but the re-examination forms do not document any such improvement.  Despite the lack of improvement shown on reevaluation forms (at least for those few patients

who receive a reevaluation), no effort is made by John Mufarreh, Gover, or other chiropractors at Warren to modify the treatment plans for the patients, as one would expect if the patients truly weren't improving.

71.     Warren has billed State Farm, on average, more than $14,000 per patient, despite the fact that most of the injuries it purports to treat should heal within a matter of weeks either through no intervention or an individually tailored treatment plan based upon the unique circumstances of each patient.  Moreover, while any one of the modalities that are part of the Predetermined Protocol might be medically necessary for a particular patient on a particular day, this comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone on virtually every visit.

72.     The Predetermined Protocol is not designed to benefit patients, but to enable the defendants to exploit the patients' No-Fault Benefits, and to inflate the value of their BI Claims and UM Claims to curry favor with the PI Attorneys with whom defendants have *quid pro quo* cross-referral relationships.

### 4.     MRI's

73.     The ordering of medically unnecessary MRIs is another component of the defendants' scheme.  MRIs are advanced imaging procedures that should only be performed after an individualized determination is made on each patient that it is medically necessary.  For example, MRIs may be ordered when a patient's

diagnostic picture is particularly unclear, response to treatment is atypical or not significant, or there are legitimate concerns about structural damage or internal injuries to the patient. When MRIs are ordered, they should be limited to the targeted body part or area of interest. It is thus uncommon to order MRIs on all regions of the spine or often more than one region.

74.      When MRIs are clinically indicated and ordered by a chiropractor, he or she should evaluate the significance of the MRI interpretations and incorporate those findings into ongoing diagnoses and future treatment plans. Specifically, chiropractors must seek clinical corroboration as to whether any of the identified abnormalities in the MRI interpretations are symptomatic and/or present any clinical significance to the patient. For instance, it is well-established that many of the abnormalities identified by MRIs have no clinical significance and result in no identified symptoms for the patient. In addition, many abnormalities identified by MRIs are related to patients' normal aging process or are of a historical nature and have no correlation with any acute injury. As a result, it is important for the chiropractor treating a patient for an acute injury to differentially determine which, if any, abnormalities identified by MRIs may be related to the presenting symptoms and/or any acute injury, and then to factor that information into the differential diagnosis and future treatment plan accordingly.

75.     Almost half the Warren patients were referred for MRIs, *see* Ex. 1, and in almost every one of those instances MRIs were ordered and obtained for both the cervical and lumbar regions of the spine.  These MRIs were ordered at various, seemingly random points in the patients' course of treatment.

76.     Moreover, regardless of the MRI findings, the treatment of patients at Warren did not change, proving that the MRIs were not ordered because they were medically necessary.  After receiving MRIs, patients returned to Warren and continued with the same Predetermined Protocol that were getting before the MRIs were ordered.  In fact, there are no notes within the patients files indicating the MRI reports were reviewed at all or discussed with the patient, which has been confirmed in depositions by some of the Warren patients.

77.     At least one patient has testified that the patient never even underwent an MRI even though John Mufarreh referred the patient for one and State Farm was billed for one.  While it could be expected that a patient may not remember every medical test they received, anyone receiving an MRI, which entails being put in a constricting chamber for a long period of time while the machine's magnets can be heard pulsating, is an experience one would likely not forget.

78.     John Mufarreh, Gover, and other chiropractors at Warren Chiropractors appear to steer most of their patients to three MRI centers:  Bio Magnetic Resonance,  Central Medical Imaging, and Magnetic Resonance Imaging

of Southfield.   The medically unnecessary MRIs are an integral part of the defendants' scheme because:  (a) the MRI findings of abnormalities can be used to justify the need for continued treatment at Warren; (b) the MRI centers charge exorbitant rates of up to $7,000 per spinal region, which is several times higher than hospitals in the same geographic areas charge for the same services; and (c) the PI Attorneys use the MRI findings of abnormalities to support the "objective manifestation" of serious bodily impairment necessary for a BI or UM claim, and the exorbitant MRI charges inflate the value of such claims.  As a result of the referrals made by John Mufarreh, Gover and other chiropractors at Warren, State Farm has been billed more than $750,000 for MRIs on the Warren patients.

### F.     State Farm's Justifiable Reliance.

79.     Defendants are obligated legally and ethically to act honestly and with integrity.  Yet, defendants submit or caused to be submitted, bills and related documentation that are fraudulent in that they represent that the services were medically necessary when, in fact, they either were not performed or were not medically necessary and were performed pursuant to a Predetermined Protocol that was designed to:  (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the defendants have a substantial *quid pro quo* cross-referral relationship.

80.     State Farm is under statutory and contractual duties to pay No-Fault Benefits for medically necessary services within 30 days.  The bills and supporting documents that defendants submitted, and caused to be submitted, to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.

81.     As a result, State Farm has incurred damages of more than $1,000,000.  Sample bills from Warren Chiropractic and Priority Transport can be seen in Exhibits 6 and 7.

82.     Based upon defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Complaint.  Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

## V.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against All Defendants)

83.     State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 82 above.

84.     The defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of bills and related documentation that contained false representations of material fact.

85.     The false representations of material fact include that:   (a) John Mufarreh, Gover, and other chiropractors at Warren legitimately examined, diagnosed, and prescribed treatment that was medically necessary and tailored to the unique needs of each patient, when in fact they did not do so; (b) John Mufarreh, Gover, and other chiropractors at Warren legitimately determined that patients were disabled; (c) John Mufarreh, Gover, and other chiropractors at Warren provided treatments that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) John Mufarreh, Gover, and other chiropractors at Warren ordered diagnostic tests, x-rays and MRIs, that were medically necessary and tailored to the unique needs of each patient, when in fact they were not; and (e) the transportation

services provided by Priority Transport to Warren patients were medically necessary when, in fact, they were not. The bills and dates of first mailings are described in Ex. 1.

86. The defendants knew that the above-described misrepresentations made to State Farm relating to the purported examination, evaluation, diagnoses, treatment and transportation of patients were false and fraudulent when they were made.

87. The defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm into relying on the misrepresentations.

88. As a result of its justifiable reliance on these misrepresentations, State Farm has incurred damages of at least $1,000,000.

WHEREFORE, State Farm demands judgment against the defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. §1962(c)
### (Against All Defendants)

89.     State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 82 above.

90.     The defendants formed an association-in-fact "enterprise" ("the Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

91.     The members of the Fraudulent Billing Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.  The defendants forged symbiotic relationships and needed and depended upon the participation of the others to accomplish their common purpose of defrauding State Farm through fraudulent insurance claims. Specifically, John Mufarreh and Keith Gover, purport to examine and diagnose the patients, and order, perform, or direct all the medically unnecessary services at issue.  Warren is the entity through which John Mufarreh and Gover submit bills and related documentation for the medically unnecessary treatment provided to patients.  Priority Transport, along with Sharon Smith and George Mufarreh, provide and bill for the medically unnecessary transportation services for Warren's patients.  The participation and role of all defendants was necessary to the success

of the scheme.  No defendant was capable of carrying out the scheme without the participation of the others.

92.    The defendants are or have been employed by and associated with the Fraudulent Billing Enterprise.

93.    The defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm thousands of bills and related documentation for the examinations, diagnoses, treatment and transportation of Warren patients that were fraudulent.  The claims contained the following misrepresentations:  (a) John Mufarreh, Gover, and other chiropractors at Warren legitimately examined, diagnosed, and prescribed chiropractic treatment that was medically necessary and tailored to the unique needs of each patient, when in fact they did not do so; (b) John Mufarreh, Gover, and other chiropractors at Warren legitimately determined that patients were disabled; (c) John Mufarreh, Gover, and other chiropractors at Warren provided treatments that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) John Mufarreh, Gover. and other chiropractors at Warren ordered diagnostic tests, x-rays and MRIs, that were medically necessary and tailored to the

unique needs of each patient, when in fact they were not; and (e) the transportation services provided by Priority Transport to Warren patients were medically necessary when, in fact, they were not.

94.     The bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Ex. 1.

95.     State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $1,000,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against the defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. §1962(d)
### (Against All Defendants)

96.     State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 82 above.

97.     The defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mail to submit to State Farm hundreds of bills for examinations, diagnoses, and treatments, which were not performed or were performed pursuant to a Predetermined Protocol.

98.     The bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Ex.1.

99.     The defendants agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission to State Farm of bills and related documentation for examinations, diagnoses, and treatments and transportation services that were fraudulent.

100.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $1,000,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against the defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Against All Defendants)

101.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 82 above.

102.   State Farm conferred a benefit upon the defendants by paying their claims and these defendants voluntarily accepted and retained the benefit of those payments.

103.   Because the defendants knowingly submitted, and caused to be submitted, bills and related documentation for examinations, diagnoses, treatments, and transportation services that were fraudulent, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

104.   As a direct and proximate result of the above-described conduct, State Farm has been damaged and the defendants have been enriched by more than $800,000.

WHEREFORE, State Farm demands judgment against the defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## FIFTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against Warren and Priority Transport)

105.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 82 above.

106.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

107.   There is an actual case and controversy between State Farm, on the one hand, and Warren and Priority Transport, on the other hand, as to all charges for examinations, diagnoses, treatments, and transportation services that have not been paid.   State Farm contends that these defendants are not entitled to reimbursement for any of these charges.

108.   Because Warren and Priority Transport have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, these defendants are not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that Warren and Priority Transport are not entitled to reimbursement for any of the unpaid charges for the examinations, diagnoses, and treatments; and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a

trial by jury.

Dated this 15th day of April, 2014.

KATTEN MUCHIN ROSENMAN, LLP

By:  s/ Thomas W. Cranmer
   Thomas W. Cranmer (P25252)
   Miller, Canfield, Paddock & Stone
   P.L.C.
   840 W. Long Lake Road, Suite 200
   Troy, Michigan  48098
   (248)-267-3381
   cranmer@millercanfield.com

   Ross O. Silverman (IL 6226560)
   Michael M. Rosensaft (NY 4247250)
   Patrick C. Harrigan (IL 6289678)
   Katten Muchin Rosenman LLP
   525 West Monroe Street
   Chicago, IL  60661-3693
   (312) 902-5200
   ross.silverman@kattenlaw.com
   michael.rosensaft@kattenlaw.com
   patrick.harrigan@kattenlaw.com

   *Attorneys for Plaintiff State Farm*
   *Mutual Insurance Company*