# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-11521 |
| | ) | |
| | ) | Hon. Mark A. Goldsmith |
| Warren Chiropractic & Rehab Clinic P.C., | ) | |
| John Mousa Mufarreh, D.C., | ) | Magistrate Judge |
| Keith Gover, D.C., | ) | Mona Majzoub |
| Priority Patient Transport, LLC, | ) | |
| George Mousa Mufarreh, and | ) | |
| | ) | |
| Sharon Michele Smith, | ) | |
| | ) | |
| Defendants. | ) | |

## STATE FARM'S RESPONSE TO APPLEBAUM & STONE, PLC'S MOTION TO QUASH RULE 30(b)(6) DEPOSITION SUBPOENA AND FOR A PROTECTIVE ORDER [ECF No. 88]

i

## ISSUE PRESENTED

Whether the Court should quash State Farm's Rule 30(b)(6) Deposition Subpoena, which seeks testimony from personal injury law firm Applebaum & Stone, PLC f/k/a Weiner & Associates PLLC ("Applebaum") regarding documents that Applebaum produced in response to a subpoena *duces tecum* confirming its *quid pro quo* referral relationships with Defendants and financial arrangements with runners and referral hotlines involved in the unlawful and unethical solicitation of automobile accident victims.

**State Farm's position:**          **No.**

**Applebaum's position:**          **Yes.**

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

Fed. R. Civ. P. 26(b)(1)

Fed. R. Civ. P. 26(c)(1)

Fed. R. Civ. P. 45

*State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, No. 12-CV-11500, 2013 WL 10936871, at *8 (E.D. Mich. Nov. 26, 2013)

*Allstate Ins. Co. v. Nassiri*, No. 2:08-CV-369 JCM GWF, 2011 WL 2516943, at *2 (D. Nev. June 23, 2011)

## I.    INTRODUCTION

Applebaum & Stone, PLC ("Applebaum") is a Detroit personal injury law firm that represents individuals involved in automobile accidents, which until 2013 was known as Weiner & Associates, PLLC ("Weiner").   Applebaum, formerly known as Weiner, has a long history with Defendants John Mufarreh, D.C. ("Dr. Mufarreh"), Warren Chiropractic and Rehab Clinic P.C. ("Warren"), and Priority Patient Transport, LLC ("Priority") and has represented over 250 clients who have been treated at Warren and/or driven by Priority.   Discovery in the case confirms State Farm's allegations that Applebaum, as well as other personal injury law firms, used "runners" and "chasers" such as Joseph Coleman ("Coleman") and Edward White ("White"), as well as toll-free injury referral hotlines, such as 800-411-PAIN ("411-PAIN"), to exploit individuals involved in automobile accidents by soliciting them to sign contingency fee agreements under which the lawyers would receive one-third of their clients' claims.

To maximize the value of their client's claims, the law firms - directly, and through White and Coleman - steered their clients to Warren and Dr. Mufarreh, who could be counted on to deliver: (1) a predetermined diagnosis that their clients were seriously injured, and (2) a course of uniform treatment that would last for months or years, regardless of the clients' condition or their unique needs to take advantage of Michigan's unlimited No-Fault benefits.   Warren's fraudulent

1

treatment thus directly benefited Dr. Mufarreh financially through the No-Fault claims that Warren submitted directly to State Farm, but also substantially inflated the value of the patients' personal injury claims, which, in turn, increased the contingency fees recovered by Applebaum and the other law firms. This arrangement created a symbiotic relationship between Warren and Dr. Mufarreh, on the one hand, and Applebaum and other law firms, on the other hand, in which each needed the other to fully exploit the economic opportunities presented by automobile accident claims.

This case also presents a textbook example on the evils of ambulance chasing. Patients have testified that within an hour or day of their accident, they received unsolicited telephone calls from people they did not know directing them to seek treatment at Warren. The unwitting accident victims would be driven to Warren by Priority or another transportation company, where they would meet privately with "private investigator" White, who would explain how the patient could financially benefit by becoming a client of Applebaum (or other law firms for which White worked) and by treating at Warren. The patient would then receive a predetermined diagnosis from Dr. Mufarreh or Dr. Keith Gover and begin Warren's fraudulent treatment protocol, which would typically continue until the patient's claim or lawsuit was resolved. Settlement records produced by Applebaum and other law firms highlight that the clients received little from their

2

settlements, instead of the lucrative proceeds promised by lawyers and White, as the bulk of the proceeds actually went to the law firms and to Defendants.

After documents obtained from: (1) Applebaum and other third parties; and (2) deposition testimony from Coleman, White, and other personal injury lawyers each confirmed Applebaum's role in the ambulance chasing, State Farm issued a Rule 30(b)(6) deposition subpoena to Applebaum on February 26, 2016 (the "Subpoena") on four discrete topics seeking information relevant to this case.

This brief is organized in six sections. Following this section, Section II explains Applebaum's history and its prior identity as Weiner. Section III discusses the critical role that law firms' solicitation of accident victims play in the scheme and the evidence State Farm has gathered to date that implicates Applebaum in this illegal and unethical conduct, including its payments to "runners" and "chasers," such as White, and its arrangement with a lawyer referral hotline. Section IV describes the Subpoena to Applebaum, and Section V sets forth the applicable legal standards governing Applebaum's motion. Lastly, Section VI explains why the motion should be denied and why Applebaum should be ordered to appear for a deposition on the topics enumerated in the Subpoena.

## II.   A HISTORY OF APPLEBAUM & STONE PLC F/K/A WEINER & ASSOCIATES PLLC

Publicly available corporate records from the Michigan Department of Licensing and Regulatory Affairs ("LARA") confirm that Applebaum is the same

3

firm once known as Weiner & Associates, PLLC. Weiner was formed on June 5, 2008 by attorney Cyril Weiner and issued the LARA identification number E0987C. Ex. 1. On February 15, 2013, Cyril Weiner filed a Certificate of Amendment to the Articles of Organization that changed the name of the entity to "Applebaum & Stone, PLC," but the LARA number of Applebaum's Articles of Organization remained the same. Ex. 2.

Weiner had a good reason to change the name of the firm. Weiner's 2013 name change came on the heels of a legal malpractice and civil conspiracy lawsuit filed against the firm in 2012 by the estate of a former client in *Stephanie Reese v. Weiner & Associates, PLLC, et al.*, Case No. 12-003531-NO (Wayne Co. Circ. Ct.). Ex. 3. That suit, which also named as defendants attorneys Cyril Weiner, Ron Applebaum, Erik Stone, a toll-free referral hotline 800-US-LAWYER, and several healthcare providers, alleged that Leah Carpenter ("Carpenter") was steered by the hotline to the Weiner firm after her auto accident. (*Id.* at ¶¶ 26-27.) Although Carpenter did not complain of any injuries or seek any medical treatment after the accident, she retained Weiner who referred her to various medical providers with whom the firm had a referral relationship. (*Id.* at ¶¶ 25-30.) The suit alleged that Weiner referred Carpenter for medically unnecessary procedures that rendered her a quadriplegic and ultimately led to her death at age 37. *See* Ex.

4

3. Less than a year after the suit was filed, Weiner changed its name to Applebaum. *See* Ex. 2.

It is clear that Applebaum, formerly known as Weiner, has a longstanding relationship with the Defendants, the extent to which is currently unknown. For example, Applebaum represented at least 18 Warren patients insured by State Farm. The Defendants' bank records reflect over 110 checks from Applebaum to Warren, Priority, and to Dr. Mufarreh, totaling over $225,000, which are likely proceeds from settlements for patients who treated at Warren. Emails between Defendants and Applebaum also identify over 250 other clients who treated with Warren and/or were transported by Priority. Deposition testimony in this case will confirm the nature and extent of Applebaum's relationship with the Defendants.

## III.    THE ROLE OF PATIENT SOLICITATION IN THE SCHEME

Discovery has confirmed that the solicitation of automobile accident victims is a critical aspect of the scheme, as alleged in State Farm's Complaint, because the financial success of the scheme depends almost entirely on the number of patients that the Defendants are able to draw into their web. Specifically, State Farm has confirmed that Dr. Mufarreh engaged in several illegal and unethical arrangements to obtain patients for medically unnecessary services from 2009 to date. For example, Dr. Mufarreh had a kickback agreement with the personal injury law firm Paskel Tashman & Walker ("Paskel") and "private investigator" Coleman under

which Dr. Mufarreh paid one-third of Paskel's "advertising" costs from R.W. Lynch, which operates websites and hotlines to steer "leads" to personal injury lawyers.  In return, Paskel agreed to refer his "leads" to Warren.  [*See* ECF Nos. 74 and 86].  Dr. Mufarreh also paid a Florida business called USA Direct, LLC to refer him accident victims from a different injury hotline, 855-PAIN-LINE.

The Defendants' most lucrative *quid pro quo* arrangements, however, have been their relationships with personal injury law firms, including Applebaum, who refer their clients to Warren to deliver what they need to inflate the value of their clients' claims and thereby bolster their contingency fees:  (1) predetermined diagnoses of injuries and disability certificates; and (2) months or years of unnecessary chiropractic treatment.  To circumvent the various Michigan laws and ethical rules[1] that prohibit directly soliciting accident victims immediately after their accidents, Warren and the lawyers, including Applebaum, pay "private investigators," such as White and Coleman, to act as "chasers" or "runners" to do indirectly what they are forbidden from doing directly: to solicit accident victims to become clients, sign contingency fee agreements, and treat at Warren.

A deposition taken last week of a Warren patient presents a common scenario. R.C. testified that she was involved in an accident around 3 a.m. on July 7, 2013.  Ex. 4, 3/24/16 Dep. Tr. of R.C. at 18:8-11.  She received numerous

---

[1] *See* ECF No. 86, at 8-10 (discussing Michigan statutes and ethical rules prohibiting solicitation of accident victims).

unsolicited phone calls within hours of her accident, trying to set her up with lawyers and with doctors. *Id.* at 18:15-24:21.  One caller told her that she would be paid within a few months if she filed a lawsuit, and that she should call Warren to set up an appointment. *Id.*  When R.C. told Warren that she did not require transportation, the Warren employee told her to use the service anyway. *Id.*  She then underwent treatment at Warren for over three months.  After the first month, R.C. asked that Dr. Gover restore her "ability" to go back to work, since Dr. Gover had "disabled her" from working, but Dr. Gover told her she could not go back to work. *Id.* at 52:5-53:14.  In fact, he did not change her disability certificate until approximately two months later, in January 2014, when she told Warren that she would no longer continue her treatment. *Id.* at 52:10-13; 61:10-24.

As described in more detail below, Applebaum's deposition is required to sort out the conflicting testimony and documents from Dr. Mufarreh, White, Applebaum, and others regarding these arrangements to understand the nature of the solicitation activity and *quid pro quo* referral arrangement between the Defendants, the lawyers, the chasers and the hotline referral services.

### A.   Applebaum and Other Personal Injury Lawyers Paid White to Solicit Accident Victims To Treat at Warren.

One of the central players in the scheme was "private investigator" Ed White, who was paid by both Dr. Mufarreh and by several law firms, including Applebaum.  As detailed in other briefs filed with the Court (*see* ECF Nos. 74 and

7

86), White has testified that he was paid by Dr. Mufarreh to "advertise" for Warren but has denied that those payments were for soliciting accident victims.   Ex. 5, 1/5/16 Dep. Tr. of E. White at 23:13-24:23.   He was also paid by Applebaum to meet with accident victims and to sign them up as clients.   *Id.* at 15:24-25; 17:18-20; 23:16-20; 106:16-107:6.   White testified that Applebaum gave him a set of blank forms to use with accident victims, which included unsigned contingency fee contracts.   *Id.* at 77-83:8.   White testified would also receive phone calls and text messages from Applebaum with the accident victims' contact information.   *Id.* at 84-88.   An Applebaum employee would also tell White whether the potential client was associated with the 411-PAIN injury hotline, in which case, MCAA's forms were to be used.   *Id.* at 100-102.   White testified he used these forms in meetings with accident victims to explain that they were entitled to different types of No-Fault benefits, including wage loss, attendant care, medical, and transportation services.   *Id.*   These meetings would take place at the victims' homes, restaurants, or in a conference room at Warren.   *Id.* at 127:17-128:24; 143:10-144:14.

Even though some of these meetings took place at Warren, White denied that he recommended Warren - or any particular healthcare provider - to the accident victim, stating, "it's the law firm's decision as to where the patient treats." *Id.* at 95:25-96:1; 96:20-97:6.   After getting the client to sign the forms, White would return the forms to Applebaum with an invoice and then receive a check

8

from Applebaum a week later. *Id.* at 98-101. If White was unable to sign the accident victim up as a client, he would not be paid. *Id.* at 104.

State Farm also recently received phone records from a subpoena to AT&T that further confirm White's longstanding relationship with Applebaum. The AT&T records show a total of over 200 calls between White's cell phone and the main telephone numbers at Weiner between January 2010 and July 2012 and the Applebaum firm from August 2013 and January 2016.

## B.   Applebaum's Document Production.

State Farm issued a subpoena to Applebaum seeking records relating to its arrangements with the Defendants, White, injury referral hotlines as well as specific communications regarding 18 clients who were insured by State Farm. Ex. 6. Applebaum did not lodge any objections, produce a privilege log, or otherwise indicate that its document production was incomplete. Applebaum produced over 300 pages of records relating to a handful of clients who were represented by Applebaum (or by Weiner under its prior name), including correspondence and payments to Warren and Priority forwarding their shares of settlement proceeds. These records illustrate that the firm's injured clients receive a fraction of the proceeds, with the majority of the money going to Applebaum,

Warren, Priority, and, in some cases, a litigation funding company.[2]  For example,

State Farm's settlement payments of $20,000 (first party) and $15,000 (UM claim)

for patient W.B. was distributed as follows:

| Recipient | Amount | Percentage |
|---|---|---|
| Weiner & Associates, PLLC | $10,747.62 | 32.30% |
| Warren Chiropractic | $4,203.75 | 12.63% |
| Priority Patient Transport | $4,135.78 | 12.42% |
| Plaintiff Investment Funding | $5,900.00 | 17.72% |
| Other providers | $4,343.20 | 13.05% |
| W.B. (Client) | $3,960.69 | 11.90% |

Ex. 7, W.B. Settlement Statements.

Applebaum also produced a client questionnaire form completed by "E. White" and a $200 invoice from White's business, E. White & Sons, to Applebaum for interviewing that same client.  Ex. 8.  Applebaum did not produce any checks or other records showing payments to White for that invoice or any other client, despite White's testimony that Applebaum always paid him by check.[3]  Ex. 5, 1/5/16 Dep. Tr. of E. White at 100:1-4.  Applebaum also produced contingency fee agreements containing language stating, "[a]s you know, Motor City Accident Attorneys, PLLC (MCAA) referred you to the firm . . . MCAA will

_____

[2] For example, Plaintiff Investment Funding is a litigation funding company that advances funds to plaintiffs in exchange for a lien against any settlement proceeds.  *See* Ex. 7.  This is especially appealing to automobile accident victims who have little or no access to credit and whose primary "asset" is their unlimited injury claim.   These arrangements, however, improperly prey on patients who end up receiving very little from their settlements.

assist the firm in prosecuting your case" and Applebaum "will share a percentage of the fee with MCAA."  Ex. 9.  Applebaum also produced checks from the firm paid to MCAA that reflect a distribution of settlement proceeds.  *See* Ex. 10.

### C.    The Lobb Deposition Confirms State Farm's Allegations Regarding the Defendants' Quid Pro Quo Relationships with Personal Injury Law Firms and with "Runners."

Witnesses have offered conflicting testimony regarding the nature of the Defendants' referral relationships with White, Coleman, and the law firms, which also raise questions about Applebaum's production.  For example, witnesses have offered conflicting accounts of who White worked for, how he was paid, and the "services" he provided.  Dr. Mufarreh testified that he paid White, but only in checks drawn on Warren's business account.  Ex. 11, 2/5/16 Dep. Tr. of J. Mufarreh, at 321:14-322:24.  However, White testified that he received payments from Dr. Mufarreh in both cash and check form.  Ex. 5, 1/5/16 Dep. Tr. of E. White, at 15:18-17:20.  Although Dr. Mufarreh has denied paying cash to White, White's testimony that he was indeed paid in cash is supported by the fact that Dr. Mufarreh withdrew more than $1.4 million in cash from 2008 to 2014, which include the years that White worked for Mufarreh.  Determining the precise timing, number, method, and purpose of payments that Dr. Mufarreh made to White is

---

[3] While State Farm does not know the extent of the payments between Applebaum and White, bank records from investigator Coleman, who provided similar services as White (*see* ECF Nos. 74, 86), show at least $7,800 in checks drawn on the bank accounts of Weiner (and later Applebaum) paid to Coleman Investigations.

further complicated by the fact that neither White nor Dr. Mufarreh produced any checks or other documents reflecting such payments. *Id.* at 40:12-41:9.

Despite their conflicting testimony, White has a long history with Dr. Mufarreh and is identified on internal Warren documents as referring a significant number of patients to Warren. For example, text messages between White and Dr. Mufarreh also suggest that White served as an intermediary in the cross-referral relationship between Applebaum and Warren. While White and Dr. Mufarreh both apparently deleted the native text messages, thus rendering it impossible to determine who authored each message or the date on which they were sent, the content of the messages is clear. One text reads, "[w]e will have a new client for you in about one week . . . . I'll have the other info when I sign him up to Applebaum," while another states, "[s]ign him up to Applebaum from 411 Pain/MCAA."[4]   Ex. 12, at EW000057, EW000065. Recently received AT&T phone records show over 900 calls and over 600 text messages between White's cellphone and Dr. Mufarreh's cellphone between 2008 and 2016.

The recent depositions of attorneys Joseph Lobb and Cherie Lobb provided further evidence about the relationships between the Defendants, the law firms, White, and the injury referral hotlines. Lobb's document production also raised

---

[4] As discussed below in Section III.B., "MCAA" is a reference to Motor City Accident Attorneys, a business associated with the 411-PAIN hotline that steered accident victims to Warren, Applebaum, and Lobb.

serious questions about the completeness of Applebaum's response to State Farm's subpoena. While Lobb and Applebaum are competitors, both firms had significant numbers of clients that treated at Warren. State Farm alleges in its Complaint that both had *quid pro quo* referral arrangements with Warren. [ECF No. 1 ¶¶ 30, 43.] Both firms used and paid White to solicit and sign up potential clients who treated at Warren, and records from both firms reflect that some of these patients were obtained through arrangements with MCAA and the 411-PAIN hotline.

Joseph Lobb testified that he was introduced to White by Dr. Mufarreh, and that he has paid White to sign up accident victims as new clients. Ex. 13, 2/17/16 Dep. of J. Lobb at 67:8-68:24. Cherie Lobb testified that in the spring of 2013, the Lobb firm was approached by Florida lawyers to discuss an arrangement by which the Lobb firm would receive referrals of automobile accident victims from the 800-411-PAIN hotline ("411-PAIN"), and MCAA would serve as "co-counsel."[5] Ex. 16, 2/17/16 Dep. of C. Lobb at 15:1-33:1. Following these referrals, the Florida lawyers behind 411-PAIN required the Lobb firm to make contact with these individuals and obtain signed contingency fee agreements within 24 hours. Ex. 13, 2/17/16 Dep. of J. Lobb at 29:12-22. To fulfill its end of the deal, Lobb used

---

[5] Corporate records filed with LARA reflect that Motor City Accident Attorneys, PLLC, is a Michigan professional limited liability company owned by three Florida attorneys: Todd Landau, Howard Kanner, and Eric Pintaluga. Ex. 14. Until February 2016, when Todd Landau became a member of the Michigan State Bar, none of the three members or managers of MCAA identified in its annual reports were licensed to practice law in Michigan. Ex. 15.

White and other investigators to make phone calls, arrange meetings with the accident victims/potential clients, which took place at their homes and hospital rooms, and sign contingency fee agreement. *Id.* at 36:24-37:6. In exchange for the referrals, the Lobb firm agreed to pay 411-PAIN up to 50 percent of any recoveries to MCAA. Ex. 16, 2/17/16 Dep. of C. Lobb at 37:5-10. This arrangement was documented in two "Co-Counsel" contracts; one between the Lobb firm and MCAA and one between the Lobb firm and "Banyan Financial." Ex. 17. Cherie Lobb testified that other than making the referrals, MCAA provided no legal services, did not want its name on the pleadings, and the only work that MCAA did under the "co-counsel" arrangement was the collection of its 40 to 50 percent referral fee. Ex. 16, 2/17/16 Dep. Tr. of C. Lobb, at 21:13-25. Joseph Lobb testified that she understood that 411-PAIN also had a similar arrangement with Applebaum.[6] Ex. 13, 2/17/16 Dep. of J. Lobb at 28:20-23.

In light of White's and Lobb's depositions, Applebaum's document production now makes more sense. It seems to explain why some of Applebaum's contingency fee agreements contain identical language to Lobb's agreements relating to MCAA and why the firm paid MCAA significant percentages of proceeds from its settlements with State Farm. It also confirms that Applebaum

---

[6] In addition to the checks and contingency fee agreements which Applebaum produced that reference MCAA, Applebaum's website prominently displays the 800-411-PAIN hotline and the logo for "Motor City Accident Attorneys." Ex. 18.

14

paid White to solicit patients to sign contingency fee agreements. The Lobb deposition, with White's testimony, confirms that Applebaum paid White to solicit accident victims referred from 411-PAIN, who were then directed to Warren.

## IV.   STATE FARM'S DEPOSITION SUBPOENA TO APPLEBAUM

Following the White and Lobb depositions, State Farm contacted counsel for Applebaum seeking information about Applebaum's production and its efforts to comply with the subpoena. After it became clear that additional documents would not be forthcoming, State Farm issued the Subpoena, which seeks testimony on four discrete topics:

1.   The Firm's efforts to search for and collect hard-copy and electronic documents that would be responsive to State Farm's subpoena *duces tecum*, which served on you on August 26, 2015.

2.   The Firm's relationship with the Defendants, including (a) the number of Firm clients who have treated at Warren Chiropractic; (b) the Firm's handling of first-party and third-party claims and lawsuits on behalf of clients who treated at Warren Chiropractic & Rehab Clinic, P.C.; (c) the distribution of settlement proceeds from such claims including payments to any litigation funding companies any co-counsel fees; and (d) communications with the Defendants relating to the treatment of State Farm insureds, including disability certificates.

3.   Your relationship with investigator Edward T. White, Sr. ("Ed White"), including interviews of accident victims conducted by Ed White and payments from the Firm to Ed White, as well as other individuals who performed similar services.

4.   Your relationships with marketing businesses or referral services targeted to auto accident victims, including 800-411-PAIN, Motor City Accident Attorneys, P.L.L.C., WCIS Media, LLC, and MI Pro Consultants d/b/a 855-PAIN-LINE.

## V.  LEGAL STANDARD

"A subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26." *United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4513600, at *5 (E.D. Mich. Oct. 1, 2012). Under the Federal Rules of Civil Procedure (effective December 1, 2015),

> parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and ***proportional to the needs of the case***, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (emphasis added); *Hemlock Semicondutor Corp. v. Kyocera Corp.*, No. 15-CV-11236, 2016 WL 67596, at *18 (E.D. Mich. Jan. 6, 2016) (applying the amended Rule 26 standard to a non-party's motion to quash). Under the amended Rule 26, "the parties' responsibilities remain the same as they were under the previous iteration of the rules, so that the party resisting discovery has the burden of showing undue burden or expense." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14-CIV-9792WHPJCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (applying the amended Rule 26 standard).

"The test for whether or not such a subpoena should be quashed is one of relevance, and the initial burden is placed on the party seeking to quash." *State Farm Mut. Auto. Ins. Co. v. Physiomatrix*, *Inc*., No. 12-CV-11500, 2013 WL

16

10936871, at *8 (E.D. Mich. Nov. 26, 2013). Thus, a non-party subpoena must be quashed only if it "fails to allow a reasonable time to comply, exceeds the geographical limits specified in Rule 45(c), requires disclosure of privileged or other protected matter or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A); *Malibu Media, LLC v. Doe*, No. 15-10307, 2015 WL 1886210, at *1 (E.D. Mich. Apr. 24, 2015).

Under Rule 26, the Court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "To show good cause, a movant for a protective order must articulate specific facts showing clearly defined and serious injury resulting from the discovery sought and cannot rely on mere conclusory statements." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (citing *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C.1987)).

## VI. DISCUSSION

Applebaum's motion should be denied because State Farm's Subpoena seeks highly relevant evidence that is proportional to the needs of the case under Rule 26(b)(1). The Subpoena also does not meet any of the criteria requiring a court to quash the Subpoena under Rule 45 or for a protective order under Rule 26(c). Contrary to Applebaum's unsupported assertions, the Subpoena is not intended to harass Applebaum, does not seek confidential information, or impose an undue

17

burden on Applebaum, nor was it issued to gather evidence for other litigation or any other improper purpose. Finally, Applebaum's suggestion that the scope of the deposition questioning should be limited to specifically identified patients ignores case law from this district that holds that State Farm is entitled to understand the full nature of the alleged *quid pro quo* relationship between Applebaum and the Defendants.

### A.   Applebaum and Weiner Are the Same Law Firm.

As an initial matter, it cannot be disputed that Applebaum is the same entity formerly known as Weiner & Associates that was formed in 2008. *See* Section II, *infra*. Applebaum's attempt to minimize its role in the scheme by hiding behind its name change, including through attorney Ron Applebaum's sworn affidavit that incorrectly states that the Applebaum firm "was formed in 2013 and only represented (8) of the plaintiffs identified on the State Farm subpoena" is disingenuous at best. [ECF 88-5, at ¶ 4.]   In response to State Farm's earlier subpoena, Applebaum produced numerous records bearing Weiner's name, including correspondence from Weiner.   Applebaum also produced copies of letters it sent to Warren and Priority on ***Applebaum*** letterhead in March 2014 enclosing checks for settlement proceeds drawn on ***Weiner's*** IOLTA account. *See* Ex. 7.   The Court should thus reject Applebaum's effort to downplay its role in the scheme and its connections to the Defendants.

18

**B.      The Rule 30(b)(6) Deposition of Applebaum Seeks Relevant and Discoverable Information.**

Applebaum reasons that because it is not a party to the case, Applebaum's knowledge relating to the Subpoena's topics is irrelevant.  [*See* ECF No. 88, at 13.] Applebaum also claims that State Farm's deposition seeks to "intrusively dig into Applebaum's business practices and inquire about individuals that, like Applebaum, are nonparties to this action, and further have no connection to Plaintiff's claims against the Defendants."  [*Id.*]  Applebaum is wrong.  The above-described testimony and documents explain that the relationships between the Defendants, Applebaum, White, and MCAA are directly relevant to State Farm's allegations.   State Farm expects that Applebaum's testimony about the history, scope, and mechanics of these relationships will illuminate a key component of the Defendants' fraud scheme.

Applebaum's own documents defeat its argument that the firm's arrangements with White and MCAA have "no connection to Plaintiff's claims against the Defendants."   Applebaum has produced records reflecting its relationships with MCAA and White that are directly tied to patients at issue in this case whom State Farm identified on its subpoena, including invoices from White to Applebaum and checks from Applebaum to MCAA.  *See* Ex. 19.  For example, Applebaum produced documents relating to its representation of client, K.B., who

began treating at Warren the day after her October 1, 2013 accident. Applebaum produced: (1) an interview form completed by "E. White" for K.B. dated October 10, 2013, which identifies the "Referral Source" as "Warren Chiropractic/MCAA– MP"; (2) a $200 invoice from White to Applebaum for his October 10, 2013 meeting with K.B.; (3) a contingency fee agreement signed by K.B. on October 10, 2013 acknowledging that Applebaum would pay MCAA a referral fee; and (4) checks from Applebaum to MCAA distributing proceeds from K.B.'s settlement. *See* Exs. 8-10. These records suggest that Warren (and MCAA) referred K.B. to Applebaum, but testimony from Applebaum is needed to know for sure. Applebaum's deposition testimony will help illuminate the nature of the referral relationship between the Defendants, Applebaum, MCAA, and White.

State Farm is entitled to discover the full contours of these referral arrangements under which Applebaum benefits from Warren's fraudulent treatment and the Defendants benefit from a steady stream of referrals from Applebaum. For example, where a lawyer is alleged to have a referral arrangement with a healthcare provider, courts have allowed deposition testimony of a law firm to discover the full nature of that lawyer's relationship with a party. *See, e.g.*, *Allstate Ins. Co. v. Nassiri*, No. 2:08-CV-369 JCM GWF, 2011 WL 2516943, at *2 (D. Nev. June 23, 2011) (compelling attorney's deposition related to the attorney's "referral arrangement with the defendants," "knowledge of and experience with the

defendants, knowledge of and experience with the medical records generated," and the "interactions with the owners and employees of Advanced Chiropractic.")

Federal courts have also held that discovery into a party's relationship with a law firm is relevant when "information already disclosed reveals an extensive financial relationship between" the firm and the healthcare provider, and such discovery "would show the extent of the financial relationship between" them. *Crable v. State Farm Mut. Auto. Ins. Co*., No. 5:10-CV-402-OC-37TBS, 2011 WL 5525361, at *7 (M.D. Fla. Nov. 14, 2011) (permitting discovery into personal injury law firm's relationship with healthcare provider); *see also Crawford v. McColister's Transp. Sys., Inc.,* No. 13-60402-CIV, 2013 WL 5687861, at *2 (S.D. Fla. Oct. 2, 2013) (allowing discovery into whether lawyers referred patients to particular medical providers).  State courts have also allowed discovery into the relationship between a law firm and a physician's financial relationship in other states where similarly symbiotic relationships exist between high volume personal injury lawyers and No-Fault mills.  *See*, *e.g.*, *Steinger, Iscoe & Greene, P.A. v. GEICO General Ins. Co.,* 2012 WL 5870041 (Fla. 4th DCA 2012); *Brown v. Mittelman*, 152 So.3d 602 (Fla. Dist. Ct. App. 2014 (citing *Morgan, Colling & Gilbert, P.A. v. Pope*, 798 So. 2d 1 (Fla. Dist. Ct. App. 2001)).  For example, in *Garcia v. Hayes Brothers Funeral Home Inc., et al*, the Florida Appellate Court permitted discovery into the following issues:  (1) whether the medical provider

21

received referrals from 800-411-PAIN; (2) whether the provider made "payments to 411 Pain in connection with advertising or a referral relationship"; (3) whether the law firm (Pendas Law) made referrals to the provider defendant or whether the provider referred patients to the firm; and (4) whether the law firm paid the defendant provider for such referrals. Ex. 20, *Garcia v. Hayes Brothers Funeral Home Inc., et al*, Case No. 11-CA-08439-O, Filing # 30294504 (July 30, 2015 Fla. App. 5th Dist.). The *Garcia* court allowed this discovery based on a patient's testimony that she was solicited and referred to the defendant provider through 411-PAIN, and that she was introduced to her lawyer during her treatment. *Id.*

Like the law firms in the cases cited above, Applebaum has a longstanding history of representing clients who treat at Warren and/or are driven by Priority. Applebaum's website and document production confirm the firm's ties to 411-PAIN and MCAA and the connections with clients who treated at Warren. The firm has made a significant number of payments to the Defendants. All of this establishes that State Farm is not "fishing" for information through the deposition, but seeking to gather relevant evidence relating to its claims.

Applebaum's reliance on *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc*. is misplaced. There, Magistrate Judge Grand held that State Farm's document subpoenas to the Michael Morse and Weiner firms were permissible to the extent that they sought information relating to the alleged *quid pro quo* relationships

between the firms and the defendants, including the firms' communications and payments to "runners" and records relating to the flow of settlement proceeds. *Id.* at *10. While the *Physiomatrix* court did not permit discovery into the firms' independent and *unrelated* solicitation of accident victims (e.g., the firms' purchases of police reports), the facts here establish that Applebaum's relationships with White and MCAA are inextricably intertwined with the Defendants. *Id.*

### C.   The Deposition Should Not Be Limited to Specific Clients.

The Court should reject Applebaum's attempt to suggest that its relationship with the Defendants is limited to only eight clients who were identified on State Farm's earlier subpoena for documents because they were represented sometime after Applebaum's 2013 name change from Weiner.   As mentioned above, Applebaum and Weiner are the same legal entity, so any client of the Applebaum firm who treated at Warren is relevant for the same reasons as any client of the Weiner firm.  Beyond that, limiting the scope of questioning to the 18 known State Farm insureds would deprive State Farm of its ability to examine Applebaum about facts it has learned since its initial subpoena was served and about the records that Applebaum produced.  State Farm issued its subpoena to Applebaum prior to a single deposition being taken in the case and before it uncovered facts about Applebaum's history with White and MCAA, and obviously before Applebaum produced its documents to State Farm that seem to confirm these

23

relationships.  Drawing such a line would prevent State Farm from understanding the extent of Applebaum's relationship with the Defendants, which the *Physiomatrix* court deemed relevant and discoverable.

###    D.    The Subpoena Complies with Rule 45.

The Subpoena is otherwise appropriate and fully compliant.  State Farm provided Applebaum a reasonable amount of time to comply, notified Applebaum's counsel of its intent to issue the Subpoena on February 22, 2016, four days prior to when the Deposition Subpoena was issued, and noticed the deposition for March 16, 2016, or 19 days later.  Ex. 21.  State Farm also offered to "work with [Applebaum] to find a mutually convenient time and location" for the deposition, and Applebaum never communicated that this deposition would be a hardship.  Ex. 22, 2/26/16 E-mail (stating "we are happy to work with you and your clients to find a mutually convenient time and location" for the deposition).

Finally, while Applebaum does not argue that the deposition would invade privileged or protected information, the Subpoena does not seek privileged communications between Applebaum and its clients.  Indeed, Applebaum's document production tacitly acknowledges that the information sought by the Subpoena is not protected.  Further, State Farm's Subpoena does not implicate documents that will allow "State Farm's attorney a unique opportunity to learn about Applebaum's business practices, litigation tactics, finances, referrals, etc.,"

24

which will be improperly used in other litigation in which Applebaum's clients are adverse to State Farm. [ECF No. 88, at 15.] Applebaum offers no support for such assertions, and thus Applebaum's motion should be denied.

## VII.   CONCLUSION

For all the foregoing reasons, State Farm respectfully requests that the Court enter an Order denying Applebaum's motion and order Applebaum to designate one or more witnesses to appear for a deposition.

Dated:  April 1, 2016               By:    /s/ Patrick C. Harrigan

Ross O. Silverman (IL 6226560)
Michael M. Rosensaft (NY 4247250)
Patrick C. Harrigan (IL 6289678)
Amelia M. Chapple (IL 6317948)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com
michael.rosensaft@kattenlaw.com
patrick.harrigan@kattenlaw.com
amelia.chapple@kattenlaw.com

Thomas W. Cranmer (P25252)
David O'Brien (P65532)
Miller, Canfield, Paddock & Stone P.L.C.
840 W. Long Lake Road, Suite 200
Troy, Michigan 48098
(248) 267-3381
cranmer@millercanfield.com
obrien@millercanfield.com

*Attorneys for Plaintiff State Farm Mutual Automobile Insurance Company*

25

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 1st day of April, a true and correct copy of the foregoing Response in Opposition to ECF No. 88 was served on counsel for all parties via ECF.


<u>/s/ Patrick C. Harrigan</u>
One of the attorneys for State Farm

26